UNIVERSITY OF THE DISTRICT OF COLUMBIA FACULTY ASSOCIATION/NEA, et al., Plaintiffs,

v.

BOARD OF TRUSTEES OF THE UNIVERSITY OF THE DISTRICT OF COLUMBIA, et al., Defendants.

No. CIV.A. 97–01080 (HHK).

United States District Court, District of Columbia.

Feb. 3, 1998.

Andrew Dean Roth, Bredhoff & Kaiser, P.L.L.C., Washington, DC, for University of Dist. of Columbia Faculty Ass'n.

Andrew Dean Roth, Jeffrey L. Gibbs, Bredhoff Kaiser, P.L.L.C., Washington, DC, for Samuel F. Carcione, William B. White.

Robin C. Alexander, University of the District of Columbia, School of Law, Washington, DC, Daniel A. Rezneck, D.C. Financial Responsibility & Management Asst. Author., Washington, DC, for University of the Dist. of Columbia Bd. of Trustees, Michele V. Hagans, District of Columbia Financial Responsibility and Management Assistance Authority, Andrew F. Brimmer, District of Columbia, Marion Barry.

## MEMORANDUM

KENNEDY, District Judge.

The matters presently before the court are the plaintiffs' motion for summary judgment and the defendants' motion to dismiss. The plaintiffs are University of the District of Columbia Faculty Association, NEA, a labor organization, and two tenured members of UDC's faculty (collectively "Faculty").[1] The

---

1. The defendants in this case are the District of Columbia Financial Responsibility and Management Assistance Authority, Andrew F. Brimmer, the Authority's chairperson, the Board of Trustees of the University of the District of Columbia, Michele Hagins, the Board of Trustees Chairper-

Faculty seeks injunctive relief and a declaration that the District of Columbia Financial Responsibility and Management Assistance Authority ("Control Board") acted beyond its authority when it issued an order that purports to provide UDC's Board of Trustees ("Trustees" or "Board of Trustees") with unilateral authority to modify provisions of UDC's NEA Master Agreement ("Agreement" or "collective bargaining agreement"), a collective bargaining agreement between the Faculty and UDC. The Faculty also seeks a declaration and judgment that UDC's action in implementing a reduction-in-force ("RIF") in accordance with the Control Board's Order constitutes a breach of the Agreement. Because the Control Board does not have the authority to issue an order that authorizes an agency of the District of Columbia to nullify provisions of a collective bargaining agreement with its employees and there are no material facts in dispute, the Faculty's motion for summary judgment must be granted and the defendants' motion to dismiss must be denied .[2]

## I. BACKGROUND

The instrumentality popularly known as the Control Board was created by Congress in 1995 in response to Congress' determination that the District of Columbia is in the midst of a fiscal and management crisis. District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub.L.No. 104–8, 109 Stat. 97 ("FRMAA"). The Control Board was given wide-ranging oversight and powers over the District government's operations. Purporting to act pursuant to the powers provided by the FRMAA and the District of Columbia Appropriations Act of 1997, Pub.L.No. 104–194, 110 Stat. 2356, the Control Board promulgated the Order that is the subject of this suit.

The pertinent circumstances preceding the issuance of the Control Board's Order are as follows. In July, 1996, Congress enacted Public Law 104–194, the District of Columbia Appropriations Act, 1997 ("Appropriations Act"), for the fiscal year beginning October 1, 1996. In § 141(a)(1) of the Appropriations Act, Congress imposed a $74 million ceiling on both expenditures and the allowable deficit for the District of Columbia. As fiscal year 1997 unfolded, it became apparent that compliance with the deficit ceiling mandated by Congress was in jeopardy and that UDC was a major contributor to the rising deficit. On December 3, 1996, the Council of the District of Columbia reported, "[t]he University of the District of Columbia ("UDC") is projecting a current fiscal year deficit of at least $16.2 million. UDC was warned by its accrediting body that institutional accrediation [sic] is in jeopardy, and UDC will, in all likelihood, cease to operate in March 1997 if a gap closing plan is not finalized and implemented as soon as possible." D.C. Council Resolution 11–658, § 2(a).

On December 27, 1996, the Control Board acted to assure that the deficit ceiling was met, including making a $16.2 million "adjustment" to UDC's spending so that the University could operate within its budget. Notwithstanding this adjustment, UDC's deficit continued to mount. Concerned with UDC's continuing financial problems, Julius F. Nimmons, Jr., UDC's Acting President, apparently at the suggestion of the Control Board's chairman, by letter dated January 13, 1997, sought the Control Board's assistance, "with the crucial issues related to legal authority on [provisions of the collective bargaining agreement]" in connection with a budget plan that called for a reduction in UDC's faculty.[3]

---

son, the District of Columbia, and Marion Barry in his capacity as Mayor. All of the papers filed in this case have been signed by counsel for the Authority, Daniel Reznick, Esq., who also spoke on behalf of all defendants at oral argument on the respective motions.

2. While the Faculty has sued the Mayor, no doubt "to cover the bases," the complaint does not refer to anything the Mayor has done in either his official or individual capacity. Consequently, with respect to the Mayor, the defen-

dants' motion to dismiss must be granted and the Faculty's motion for summary judgment must be denied.

3. Acting President Nimmons' Letter to Dr. Brimmer, in part, states:

Dear Dr. Brimmer:
I want to thank you for the attention and concern you have shown for the University of the District of Columbia. Our meeting on Thursday, January 9, 1997, laid the foundation

In response to President Nimmons' January 13th letter, the Control Board, on January 22, 1997, promulgated the "Resolution and Order Concerning Collective Bargaining Agreements" that is the subject of the Faculty's complaint. In its Resolution and Order, the Control Board, *inter alia*, recited that UDC was in a fiscal crisis with a projected budget deficit for fiscal year 1997; that UDC administrators had proposed a reasonable budget reduction plan for UDC which called for a significant reduction in UDC's faculty; that UDC had a collective bargaining agreement with the Faculty with provisions for severance pay, seniority based RIFs, and pension contributions; that implementing the proposed budget reduction plan without modifying these provisions of the collective bargaining agreement would mean that "the necessary savings to ensure that UDC remains within its budget for fiscal year 1997 could not be achieved" and would "adverse[ly] impact on [UDC's] accreditation standing and [UDC's] ability to maintain the integrity of its degree programs",[4] and that Dr. Nimmons had requested the Control

Board to take action to modify the collective bargaining agreement.

Accordingly, the Control Board stated that UDC should conduct a RIF in a manner allowing it to achieve its planned budget savings notwithstanding the provisions of the collective bargaining agreement, including taking into consideration a faculty member's degrees or lack thereof in determining the order of separation and that contributions to retirement plans should be no more than seven percent (7 %) commencing March 1, 1997. The Control Board also directed the Board of Trustees to develop and approve, and submit to the Control Board, a RIF plan providing for reasonable notice and other terms of separation.

Acting pursuant to and in accordance with the directives of the Control Board's January 22 Order, the Trustees, on February 4, 1997, approved Resolution 97–3, which adopted a "Procedure [for] Reduction–in–Force for Faculty" ("Trustees' RIF Procedures"), and directed President Nimmons to submit the RIF Procedures to the Control Board.[5] On

for a productive relationship. I am particularly appreciative of your offer to assist the University with the crucial issues related to legal authority on the following five items:
- Granting UDC exemption from the NEA Master Agreement provision of one year notice or one year salary for faculty whose positions are eliminated;
- Granting UDC exemption from the NEA Master Agreement provision basing reduction-in-force exclusively upon seniority;
- Granting UDC exemption from AFSCME Agreement provision calling for 90 days notice to AFSCME employees whose positions are eliminated;
- Granting UDC exemption from the multiple 'bump' process for AFSCME whose positions are eliminated; and
- Granting UDC permission to reduce TIAA/CREF benefits to 7% of salary.

It would be impossible for the University to meet the goal of my plan without the legal authority noted in these five items.

I was encouraged to hear you say at the January 9th meeting that the [Control Board] has the authority to take these steps and I was grateful when you suggested that the University come to the Authority with such a request.
(Defs.' Mot. to Dismiss Ex. F).

4. The Resolution and Order explained that under the collective bargaining agreement faculty members with terminal degrees in their disciplines

would be terminated while faculty without terminal degrees would be retained.

5. The Trustees' RIF Procedures differ in significant respects from those prescribed in the collective bargaining agreement. Pertinent differences include notice of the RIF and severance pay. Under the agreement, a notice of intent to RIF must be given one year in advance. If advance notice is not possible, the University may give only four weeks notice but must then provide severance pay: pay equal to one academic year for faculty with two or more years of continuous service and pay equal to half of an academic year for faculty with fewer than two years of continuous service. In contrast, the Trustees' RIF Procedures provide that RIF notices would be sent by mail on February 14, 1997, and take effect February 19, 1997. All RIF'd faculty members would receive severance pay through March 31, 1997, a five and one-half week period.

The procedures to determine which faculty members are terminated and in what order also differ. The collective bargaining agreement rewards a faculty member's length of service to the institution, and, accordingly, mandates that a RIF be applied to faculty in inverse order of their date of employment, so that the newest faculty members are the first to be RIF'd. Moreover, "bumping" procedures are allowed. Thus, a faculty member who is RIF'd in one department ("bumper") and qualified to teach in another may join that other department. If this new

February 14, 1997, acting pursuant to and in accordance with the Control Board's Order, Resolution 97-3, and the Trustees' RIF Procedures, UDC implemented a RIF, initiated by sending notices to 125 members of the faculty. Moreover, on March 1, 1997, UDC reduced its contributions to the faculty's pension plan on behalf of faculty members still employed by UDC. This suit followed.

## II. THE CONTENTIONS OF THE PARTIES

The Faculty's complaint challenges the Control Board's January 22 Order on several grounds, including its contention that implementation of the Order violates several of the Faculty's constitutional rights. However, the Faculty's motion for summary judgment and opposition to the defendants' motion to dismiss are based on the straight-forward assertion that in ordering the Trustees to repudiate the collective bargaining agreement's RIF provisions and its provisions governing UDC's contributions to the faculty retirement plan, the Control Board acted *ultra vires*, the law's designation of acts that are taken by an entity which are beyond its authority as defined by its charter.

The Faculty argues that the Control Board's powers, while considerable, are limited to those set forth in its enabling act, the FRMAA. The Faculty points out that no-

where in the FRMAA's studiously detailed specification of the Control Board's powers is there any mention of a power to unilaterally repudiate unwanted provisions in collective bargaining agreements previously entered into by the District of Columbia or its agencies.

The Control Board mounts a vigorous response to the challenge to its January 22 Order, maintaining that both the FRMAA and the Appropriations Act, independently, and certainly when read together, provide authority for its actions.[6] The Control Board relies most heavily on the United States District Court's opinion in *Shook v. District of Columbia Financial Responsibility and Management Assistance Authority* (Shook I), 964 F.Supp. 416 (D.D.C.1997), *aff'd in part & rev'd in part*, 132 F.3d 775 (D.C.Cir. 1998), and urges this court to follow *Shook I's* "approach"[7] in determining the validity of its Order in this case. In *Shook I* (Kessler, J), the court held, *inter alia*, that Congress had delegated its plenary power to run the D.C. public schools to the Control Board and upheld a Control Board Order that transferred most of the powers and duties of the District's elected Board of Education to a body created by the Control Board, the Emergency Transitional Education Board of Trustees. The Control Board suggests that the *Shook I* court found the FRMAA's statement of findings and purposes[8] to be imbued

department contains a faculty member more junior than the bumper ("junior"), then bumper "bumps" junior and junior is RIF'd rather than bumper.

Under the Trustees' RIF Procedures, in contrast, the order of termination is not governed solely by a faculty member's length of service. First, the bumping provision would not be used. Second, seniority would not be considered when, in the judgment of UDC's President, it would be inconsistent with meeting the objectives of UDC's academic programs. Finally, a faculty member's degrees or lack thereof, and a faculty member's record of generating revenue for UDC through grants, awards, or contracts, may be considered when determining whom to RIF.

6. This is an appropriate place to note that the Control Board chooses to label the RIF procedures it authorized as a "modification" of the collective bargaining agreement's RIF procedures while the Faculty labels the Control Board's Order as requiring a "repudiation" of the provisions of the collective bargaining agreement. The court is of the view that nothing rides

on how the Control Board action is characterized. For this reason, in this memorandum, the court characterizes the effect of the Order in varying ways. What is important is that the Control Board's Order operates to defeat settled expectations in significant ways. See note 5, *supra*.

7. "Approach" is the term used by the Control Board's counsel at oral argument when urging the court to be guided by the court's opinion in *Shook I*.

8. For example, the FRMAA's first finding is that "[a] combination of accumulated operating deficits, cash shortages, management inefficiencies, and deficit spending ... have created a fiscal emergency in the District of Columbia," FRMAA § 2(a)(1), and its first purpose is "[t]o eliminate budget deficits and cash shortages of the District of Columbia." FRMAA § 2(b)(1). However, contrary to the Control Board's assertion in its motion to dismiss, Congress did *not* indicate that a purpose of the FRMAA is to "[save the District

with particular significance and supportive of its authority because "[w]hen the [Control Board] acted to deal with an out-of-control budgetary situation at UDC, it was acting within the central core of the responsibilities confided to it by Congress." (Defs.' Mot. to Dismiss at 16). Consequently, the Control Board asserts that this court should follow the approach it ascribes to *Shook I* and view the Congressional findings and statement of purposes and the Control Board's findings in support of its order as "key elements in determining the [Control Board's] actions under its governing statutes." *Id.*

In addition to the authority found in the text of the FRMAA as originally enacted, the Control Board claims that Congress' 1996 amendment to the FRMAA adding § 207(d) also must be read to uphold its January 22 Order.[9] The Control Board points out that § 207(d) essentially means that it is authorized to stand in the shoes of the highest District of Columbia government officials, including agency heads, whenever it is necessary to do so to accomplish its mission. In this instance, the Board of Trustees is the relevant agency head and the University is the pertinent District Government agency. The Control Board asserts that because Article X of the collective bargaining agreement grants certain management rights to the University in the event of an emergency, including the right to take whatever actions may be necessary to carry out the mission of the University in emergency situations, the University had an independent right to take the actions it took and, *a fortiori*, the Control Board did as well.

Finally, while vigorously advancing the position that the FRMAA independently provides authority for its January 22 Order, the Control Board states "[w]hen there is added the Congressional mandate of § 141(a) of the 1997 D.C. Appropriations Act, the case for the validity of the [Control Board's] actions is overwhelming." *Id.* In addition to Congress'

mandate that the District government stay under the deficit ceiling, the Control Board emphasizes that it was instructed to "take such steps as are necessary" to ensure that the District did not exceed the deficit ceiling and to employ "every means possible" to reduce the costs of operating the District government and to avoid deficit spending. Pub.L. No. 104–194, § 141(a)(2); H.R. Conf. Rep. No. 104–740 at 17 (1996).

## III. ANALYSIS

Resolution of the dispositive issue of this case requires the court to answer the question, "Did the Congress of the United States intend to give the Control Board the authority to empower a District of Columbia agency to be able to abrogate a contract, in this case a collective bargaining agreement, to which the District of Columbia or its agency is a party?" As should be apparent, the answer to the question turns upon a sound interpretation of the Congressional legislation that created the Control Board and specified its powers, the FRMAA. While the Control Board argues that the Appropriations Act also should be read to provide the answer to the question, as will be discussed later, there is simply no support for the proposition that Congress intended to or did speak to the issue of the Control Board's authority in the Appropriations Act.

Because "the meaning of statutory language, plain or not, depends on context," *Bailey v. United States.*, 516 U.S. 137, 145, 116 S.Ct. 501, 506, 133 L.Ed.2d 472 (1995), the plain meaning of language employed in Congressional legislation does not always provide conclusive proof of Congress intent. Still, it must be remembered that "the primary and general rule of statutory construction is that the intent of the lawmaker is to be found in the language that [he or she] has used." *United States v. Goldenberg*, 168 U.S. 95, 18 S.Ct. 3, 42 L.Ed. 394 (1897);

of Columbia's] only public university ." (Mem. of P. & A. in Support of Defs.' Mot. to Dismiss the Compl. at 16).

9. Section 207(d) grants the Control Board the authority to issue: such orders, rules, or regulations as it considers appropriate made by this Act, to the extent that the issuance of such an

order, rule, or regulation is within the authority of the Mayor or the head of any department or agency of the District government, and any such order, rule or regulation shall be legally binding to the same extent as if issued by the Mayor or the head of any such department or agency.

*Halverson v. Slater,* 129 F.3d 180 (D.C.Cir. 1997). Not surprisingly, given the well known concerns about how an unelected entity with considerable power over the District government's operations would affect "Home Rule," Congress has spoken directly and clearly regarding the Control Board's authority.

### A. The FRMAA

The Control Board's powers are found in § 103 of the FRMAA, which, significantly, is entitled "ESTABLISHMENT AND ORGANIZATION OF AUTHORITY," and its responsibilities are delineated in Title II, which is entitled "RESPONSIBILITIES OF AUTHORITY," an equally appropriate caption given the subject of the Title. In Title I, § 103, "for the purpose of carrying out [the FRMAA]," the Control Board, *inter alia,* is empowered to, hold hearings and receive evidence as the Control Board considers appropriate, obtain official data from the federal and District government, accept, use and dispose of gifts, bequests, and devises of services and real and personal property, issue subpoenas, enter into contracts, and to seek judicial enforcement of its authority to carry out its responsibilities under the FRMAA. FRMAA § 103.

In § 203, the FRMAA details the responsibilities of the Control Board, many of which are associated with the financial plan and budget which the Mayor is required to submit to the Control Board, for its review and approval or disapproval, for each fiscal year for which the District Government is in a control period. Section 203(b)(1)(B) makes specific reference to collective bargaining agreements. Section 203(b)(1) states in full:

(b) EFFECT OF APPROVED FINANCIAL PLAN AND BUDGET ON CONTRACTS AND LEASES.-

(1) MANDATORY PRIOR APPROVAL FOR CERTAIN CONTRACTS AND LEASES.-

(A) IN GENERAL.-In the case of a contract or lease described in subparagraph (B) which is proposed to be entered into by the District government during a control year, the Mayor (or the appropriate officer or agent of the District government) shall submit the proposed contract or lease to the [Control Board]. The [Control Board] shall review each contract or lease submitted under this subparagraph, and the Mayor (or the appropriate officer or agent of the District government) may not enter into the contract or lease unless the [Control Board] determines that the proposed contract or lease is consistent with the financial plan and budget for the fiscal year.

(B) CONTRACTS AND LEASES DESCRIBED.-A contract or lease described in this subparagraph is-

(i) a labor contract entered into through collective bargaining; or

(ii) such other type of contract or lease as the [Control Board] may specify for purposes of this subparagraph.

FRMAA § 203(b)(1).

It is self evident that the provision set forth above, the only place in which collective bargaining agreements are referenced in the FRMAA, does not grant the Control Board the authority to nullify provisions of existing collective bargaining agreements. The Faculty argues that this statutory silence coupled with Congress's specific grant of a power of prior approval over proposed agreements leads to the inescapable conclusion that Congress did not intend to confer such a nullification power on the Control Board.

The Control Board responds to the Faculty's argument by characterizing the Faculty's reading of the FRMAA as "crabbed and confined." (Defs.' Reply Mot. of P.&A. in Supp. of Mot. to Dismiss & Opp'n to Pls.' Mot. for Summ. J.at 8). In the Control Board's view, given Congress' particular concern about labor contracts, the proposition that the grant of authority to approve in advance all collective bargaining agreements impliedly limits the Control Board's power to modify existing agreements "makes no sense" and "stands the statute on its head." The Control Board states:

[I]t is an 'enormous stretch' to infer from a congressional *grant of power* (and duty) to

the [Control Board] to review and approve all new collective bargaining agreements that Congress thereby also acted to *prohibit* the [Control Board] from modifying existing agreements to effectuate the purposes of the Act. There is not a word in the statute or the legislative history to suggest that Congress intended to limit the powers of the entity it was creating when it conferred this authority on it.

*Id.* (emphasis added).

The Control Board argues for an "expansive reading" of the FRMAA, one that is substantially influenced by consideration of the FRMAA's statement of findings and purposes regarding the District's financial woes, the "sweep" of the powers delegated to it by Congress, and the "repeatedly manifested intention of Congress that the [Control Board] should stop out-of-control spending by the District government...." *Id.* at 7. The Control Board urges that "[a] fair reading of the legislation as a whole, in light of what Congress intended to accomplish, can lead to only one conclusion—the [Control Board] was given the powers it needed to carry out the Congressional purposes, first and foremost among them the reining in of deficit spending." *Id.* at 5.

The Control Board's position has some first-blush appeal. Congress has clearly indicated its grave concern about the District's financial problems, including those caused by its cash shortages and deficit spending, and has delegated a considerable portion of its plenary power over the District to the Control Board with the expectation that they will be used to address the problems recited in the FRMAA's statement of findings and purposes. However, the Control Board's claim to have a malleable set of powers limited only by what the Control Board itself deems necessary to carry out Congressional purposes cannot withstand judicial scrutiny because such a claim is antagonistic to established tenets of law.[10]

First, as the Faculty aptly points out, " '[i]t is axiomatic that an administrative agency's power to promulgate legislative regulations is limited to the authority delegated by Congress.' " *Davis County Solid Waste Management v. U.S. EPA,* 101 F.3d 1395, 1410 (D.C.Cir.1996), 108 F.3d 1454 (D.C. Cir. 1997) (quoting *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 102 L.Ed.2d 493 (1988). *modified on other grounds.* A corollary principle is that "where Congress prescribes the form in which an agency may exercise its authority, [a court] cannot elevate the goals of an agency's action, however reasonable, over that prescribed form." *Amalgamated Transit Union v. Skinner,* 894 F.2d 1362, 1364 (D.C.Cir.1990); see also *MCI Telecommunications Corp. v. American Tel. & Tel. Co.,* 512 U.S. 218, 231 n. 4, 114 S.Ct. 2223, 129 L.Ed.2d 182 (1994) ("[W]e (and the [agency]) are bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes."). The FRMAA is a detailed and comprehensive statute comprising 56 pages of text that clearly describes the powers delegated to the Control Board. It "prescribes the form" which the Control Board is required to follow in pursuing its statutory "goal." With respect to collective bargaining agreements, that "form" is limited to the power to approve or disapprove proposed collective bargaining agreements before they are entered.

Second, and even more telling, the position that the Control Board has taken in this litigation is analytically indistinguishable from one that already has been roundly rejected in *Railway Labor Executives' Ass'n v. National Mediation Bd.,* 29 F.3d 655 (D.C.Cir.1994), *cert. denied,* 514 U.S. 1032, 115 S.Ct. 1392, 131 L.Ed.2d 243 (1995). The issue in *Railway Labor Executives' Ass'n* was whether the National Mediation Board ("NMB") had the statutory authority to investigate and resolve disputes between rail-

10. The Control Board's reliance on *Shook I* is sorely misplaced. While Judge Kessler's analysis addressed the circumstances leading to the enactment of the FRMAA, and was attentive to the FRMAA's statement of findings and purposes, she employed traditional tools of statutory construction, starting with the plain language of the FRMAA, in interpreting that statute. Judge Kessler did not hold that the Control Board had any implied powers or that the Control Board was able to exercise powers not delegated to it to effect Congressional purposes.

road carrier employees over union representation either on NMB's own initiative or upon the petition of a carrier. In holding that the NMB lacked such authority, the *en banc* court relied on the plain language of the Railway Labor Act ("RLA"), which specifically addressed the subject matter of the NMB's authority to investigate and resolve disputes over union representation, and which provided that authority could be invoked "upon request" of a railroad carrier's employees. *Id.* at 664–65 (quoting § 2, Ninth of the RLA). The court observed that this plain statutory language was "quite precise" in defining the nature and scope of the NMB's authority to investigate and resolve disputes over union representation making the conclusion "inescapable" that Congress did not intend to empower the NMB to investigate and resolve such dispute in circumstances other than those set forth in the statute. *Id.* at 666.

Confronted with the plain language of § 2, Ninth of the RLA, the NMB resorted to an argument that is analytically indistinquishable from the one advanced by the Control Board in this case, *viz.*, that because Congress had not expressly withheld or negated the NMB's asserted power to investigate and resolve disputes over union representation on its own initiative or upon the petition of a carrier, the NMB was free to exercise such a power. The NMB's position was flatly rejected. Summarizing its decision, the *en banc* court explained:

> The [NMB] does not even claim that the terms of Section 2, Ninth support the authority that it asserts, and it can point to no other provision in the RLA giving it the authority to promulgate the Merger Procedures. Instead, the Board would have us presume a delegation of power from Congress absent an express *withholding* of such power. This comes close to saying that the [NMB] has the power to do whatever it pleases merely by virtue of its existence, a suggestion that we view to be incredible.

*Id.* at 659 (emphasis added). The Control Board's position, which at bottom is premised upon a presumed delegation of power absent an express withholding of such power, must also be rejected. *See American Petroleum Institute v. U.S. E.P.A.*, 52 F.3d 1113, 1120 (D.C.Cir.1995) ("[W]e will not presume a delegation of power based solely on the fact that there is not an express withholding of such power.").

Finally and quite apart from consideration of legal principles, "common sense" tells us that it is highly unlikely that Congress intended to give the Control Board the power to repudiate existing collective bargaining agreements. To sustain the Control Board's position one would have to conclude that although Congress was particularly concerned about collective bargaining agreements, leading it to grant the Control Board the power of prior approval over such contracts, it was so obviously Congress' intention also to grant the Control Board the power to repudiate existing agreements—a power the Constitution of the United denies to the States [11]—that there was no need to refer to such a power in the FRMAA or, for that matter, for any lawmaker even to allude to it during the extended discussion of the FRMAA before its enactment. To state this proposition is to refute it. Moreover, to accept this postulate is to accord Congress little respect with regard either to its ability to manipulate language adequate to the task of expressing its intention or its sensitivity to a core value of American society, the sanctity of contracts.

To this point the court has addressed the Control Board's argument that the FRMAA, as originally enacted, authorized it to issue its January 22nd Order. The court turns now to the Control Board's assertion that Congress' 1996 amendment to the FRMAA adding § 207(d) also should be read to uphold its January 22 Order.

To reiterate, the Control Board points out that § 207(d) essentially means that it is authorized to stand in the shoes of the highest District of Columbia government officials, including agency heads, whenever it is necessary to do so to accomplish its mission. In this instance, that means that the Control Board stands in the shoes of UDC's Board of

---

11. U.S. Const., Art. I, § 10, cl.1.

Trustees and the University itself which under Article X of the collective bargaining agreement retains the right, *inter alia,* to "direct faculty members," "relieve faculty members of duties because of lack of work or other legitimate reasons," and "take whatever actions may be necessary to carry out the mission of the University in emergency situations."

The Control Board argues that because UDC was in an emergency situation, as the Control Board and Council of the District of Columbia found, "[i]t appears that the University would have been independently entitled, under the collective bargaining agreement, to take the actions authorized by the Authority. If so, the Authority derived independent power from § 207(d)(1) to issue its own Order." (Mot. of all Defs. to Dismiss the Complaint at 20).

It is easy to discern why the Control Board makes this argument last in the sequence of grounds it advances in support of its position. Indeed, perhaps the use of the conjunctive **if** signals a tentativeness in advancing the argument at all. In any event, this argument need not detain us long. In Article X, the collective bargaining agreement's listing of certain rights of management is preceded by the statement that the University has these rights **only** to the extent that they are **not** "specifically limited by the provisions of this Agreement." (Fourth Master Agreement Between the U.D.C. & the U.D.C. Faculty Ass'n/NEA Art. X). Consequently, the management rights provision of Article X by its own terms does not provide the University independent entitlement to repudiate the various restrictions on its management prerogatives that the University has agreed to in collective bargaining with the Faculty, including the restrictions on the University's prerogatives to establish RIF procedures (see Article XXI) and to set contribution rates to its employee retirement plans (see Article XVIII). Because the University does not have an independent entitlement to renounce unwanted provisions in the Agreement, the Control Board, likewise, has

no authority under the 1996 amendment to compel renouncement by the University.[12]

## B. The Appropriations Act

As stated earlier, the Control Board argues that, in addition to the authority provided by the FRMAA, the Appropriations Act supports the validity of its January 22 Order. This claim is based entirely on a sentence in the Appropriations Act and a complementary sentence in the Act's legislative history. The sentence in the Appropriations Act reads:

> (2) Enforcement .—The Chief Financial Officer of the District of Columbia and [the Control Board] shall take such steps as are necessary to assure that the District of Columbia meets the requirements of this section [i.e. does not exceed its deficit ceiling for the 1997 fiscal year], including the apportioning by the Chief Financial Officer of the appropriations and funds made available to the District during fiscal year 1997.

The complementary sentence in the conference report states, "[t]he conferees urge the Mayor, the City Council, and the control board to use every means possible to reduce the costs of operating the Nation's Capital and make every effort to avoid deficit spending." H.R. Conf. Rep. No. 104–740, at 17 (1996).

It is immediately apparent that the Control Board's reliance on these provisions is misplaced. As the Faculty aptly points out, the Control Board's argument proves too much. Were the Control Board's analysis carried to its logical conclusion, it would mean that the Control Board **and** the Chief Financial Officer would have virtually "endless means to assure that the District does not exceed its deficit ceiling for the 1997 fiscal year, including the levying of new taxes on District businesses and residents, the invalidation of commercial contracts and leases, and the disavowal of the District's debts, bond obligations and pension plan commitments." (Pls.' Mot. for Summ. J. at 24).

---

**12.** While not dispositive, it is of at least some significance that the University obviously thought that it did not have an independent entitlement to abjure the RIF procedures of the collective bargaining agreement.

Clearly, this is not what Congress intended to do when it passed the Appropriations Act. Rather, in directing the Control Board to employ all "necessary" and "possible" means to keep the District's deficit within the limits it set, Congress communicated its desire for the Control Board to make full use of the powers that Congress had delegated to it in the FRMAA. This contention, unlike that advanced by the Control Board, is consistent with the "general principle that Congress cannot and does not legislate through the appropriations process." *National Wildlife Fed'n v. Andrus*, 440 F.Supp. 1245, 1249 (D.D.C.1977), *citing Atchison, Topeka and Santa Fe Ry. Co. v. Callaway*, 382 F.Supp. 610, 620 (D.D.C.1974).

## CONCLUSION

It is accurate to say that the Control Board has been give wide ranging, even "sweeping," powers over the District government's operations. However, those powers still are limited. The Control Board does not have the authority to arrogate for itself power and authority not delegated to it by Congress. Consequently, the Control Board's January 22 Order cannot be upheld and the Trustees actions in executing a RIF based on the validity of that Order likewise cannot stand. Therefore, for the reasons set forth in this Memorandum, Judgment must be entered in favor of the plaintiffs against all defendants except Mayor Barry.[13]

An appropriate order accompanies this Memorandum.

---

**13.** Given the court's determination that the Control Board's January 22 Order was issued without authority, the court need not and does not address the Faculty's challenge to that Order on Constitutional grounds.