United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued October 30, 1998 Decided December 22, 1998 

 No. 98-7024

 University of the District of Columbia 

 Faculty Association/NEA, et al., 

 Appellees

 v.

 District of Columbia Financial Responsibility 

 and Management Assistance Authority, et al., 

 Appellants

 Consolidated with 

 98-7025

 Appeals from the United States District Court 

 for the District of Columbia 

 (No. 97cv01080)

 Daniel A. Rezneck argued the cause for appellants. With 
him on the briefs was Robin C. Alexander. John M. Ferren, 

Corporation Counsel, Charles L. Reischel, Deputy Corpora-
tion Counsel, and Lutz A. Prager, Assistant Deputy Corpora-
tion Counsel, entered appearances.

 Andrew D. Roth argued the cause for appellees. With him 
on the brief was Laurence Gold. Jeffrey L. Gibbs entered an 
appearance.

 Before: Edwards, Chief Judge, Ginsburg and Rogers, 
Circuit Judges.

 Opinion for the Court filed by Chief Judge Edwards.

 Edwards, Chief Judge: In response to the District of 
Columbia's "financial problems and management inefficien-
cies," Congress enacted the District of Columbia Financial 
Responsibility and Management Assistance Act of 1995, Pub. 
L. No. 104-8, 109 Stat. 97 (1995) ("FRMAA" or "Act"). 
Under the Act, a Control Board was granted substantial 
authority over the financial management of the District. The 
scope of this statutory authority is at issue in this case.

 In 1997, in an effort to keep the District's budget under a 
congressionally-imposed deficit ceiling, the Control Board 
issued an order authorizing the Board of Trustees ("Trust-
ees") of the University of the District of Columbia ("UDC") to 
reduce its faculty "[n]otwithstanding the provisions of any 
collective bargaining agreement." Joint Appendix ("J.A.") 88. 
Appellees--UDC faculty members--contend that the Control 
Board's order was ultra vires and, therefore, without legal 
effect. Accordingly, they assert, UDC violated the collective 
bargaining agreement between the university and the faculty 
when it conducted a reduction-in-force ("RIF") that disre-
garded the specific provisions covering RIFs in the parties' 
agreement.

 We agree with the District Court that Congress did not 
grant the Control Board the authority to abrogate existing 
contracts between the District and its employees. Because 
the Control Board's action was ultra vires, we remand appel-
lees' contract claim to the District Court for a determination 


as to whether the claim should now be submitted to arbitra-
tion.

 I. Background

 Congress created the Control Board in April 1995, citing 
the District's "fail[ure] to provide its citizens with effective 
and efficient services," warning that "[t]he current financial 
and management problems of the District government have 
already adversely affected the long-term economic health of 
the District," and calling for "[a] comprehensive approach to 
fiscal, management, and structural problems ... which ex-
empts no part of the District government." FRMAA s 2(a).

 Sections 103 and 203 of the FRMAA delineate the authority 
of the Control Board, the members of which are appointed by 
the President. Under these provisions, the Control Board is 
empowered to hold hearings and receive evidence, obtain 
official data from the federal and District Government, issue 
subpoenas, enter into contracts, and approve or disapprove of 
Acts passed by the D.C. Council. See FRMAA ss 103, 203; 
see also Shook v. District of Columbia Fin. Responsibility 
and Management Assistance Auth., 132 F.3d 775, 777 (D.C. 
Cir. 1998) ("[T]he Control Board has been given wide-ranging 
powers to improve the District government's operations.").

 In July 1996, Congress enacted the District of Columbia 
Appropriations Act, 1997, Pub. L. No. 104-194, 110 Stat. 2356 
(1996) ("Appropriations Act"). Section 141(a)(1) of the Ap-
propriations Act imposed on the District a deficit ceiling of 
$74 million for fiscal year 1997. See Appropriations Act 
s 141(a)(1). Section 141(a)(2) stated that the "Chief Financial 
Officer of the District of Columbia [and the Control Board] 
shall take such steps as are necessary to assure that the 
District of Columbia meets the requirements of this section." 
Id. s 141(a)(2).

 Congress subsequently amended the FRMAA. See Omni-
bus Consolidated Appropriations Act, 1997, Pub. L. No. 
104-208, 110 Stat. 3009 (1996). The amended s 207(d)(1) 
("1996 Amendment") gives the Control Board the power to 
issue "such orders, rules, or regulations as it considers appro-

priate to carry out the purposes of [the FRMAA] ... to the 
extent that the issuance of such an order, rule, or regulation 
is within the authority of the Mayor or the head of any 
department or agency of the District government." Id. 
s 5203(f). The parties agree that the 1996 Amendment al-
lows the Control Board to "stand in the shoes" of the Mayor 
and other District officials--such as the UDC Trustees--and 
perform whatever functions those officials would be autho-
rized to perform themselves.

 As fiscal year 1997 unfolded, the District was in grave 
danger of exceeding the $74 million deficit ceiling. UDC was 
a major contributor to the deficit, so university officials were 
obliged to consider spending limitations to cut costs. Among 
the options available to UDC was a RIF of faculty members. 
This option was less than ideal, however, because UDC was 
bound to comply with the enumerated RIF and employee 
benefit protections contained in the faculty's collective bar-
gaining agreement ("CBA"). Although the CBA permits 
UDC to conduct a RIF when such action is compelled by a 
fiscal emergency, it affords important protections for the 
faculty in the event of a RIF. First, the agreement provides 
that senior members of the faculty must be retained ahead of 
junior members. See J.A. 163. Second, the agreement re-
quires that faculty members receive one year's notice of a 
RIF or severance pay in lieu thereof. See id. at 165. The 
CBA also mandates that UDC "maintain" the retirement 
plans of existing faculty members. Id. at 152.

 On January 13, 1997, Julius F. Nimmons, Jr., Acting Presi-
dent of UDC, wrote to Dr. Andrew F. Brimmer, chairman of 
the Control Board, requesting that the Control Board exempt 
UDC from the seniority, notice, and benefits provisions of the 
CBA. See id. at 84-85. Nimmons wrote that "[i]t would be 
impossible for the University to meet the goals of my [finan-
cial] plan without the legal authority" requested in the letter. 
Id. at 84.

 Nine days later, the Control Board responded by issuing 
the order at issue in this case. Noting that "a state of fiscal 
crisis exists" at UDC and that the CBA represents a "signifi-


cant impediment[ ] to the achievement of any budget savings 
through personnel reductions," the Control Board found that 
"there are no other less drastic means of achieving the 
required budget savings than through the unilateral modifica-
tion of the [CBA]." Id. at 87. Accordingly, the Control 
Board authorized UDC, "[n]otwithstanding ... the provisions 
of any collective bargaining agreement, [to] ... conduct its 
[RIF] in a manner which will allow it to achieve its planned 
budget savings." Id. at 87-88. The order specifically direct-
ed that UDC contribute no more than 7% to its employee 
retirement plans, and allowed UDC to disregard the seniority 
and notice provisions of the CBA. See id. On February 4, 
1997, the UDC Trustees implemented the Control Board's 
order by approving a RIF that did, in fact, disregard the 
applicable terms of the CBA. See id. at 103-05. UDC also 
lowered its contributions to the faculty retirement plan to 7%, 
effective March 1, 1997.

 On February 14, 1997, the UDC Faculty Association ("Fac-
ulty") challenged the RIF by filing grievances pursuant to the 
grievance procedures outlined in the CBA. UDC responded 
on April 7, 1997, in a letter stating that UDC's actions were 
not reviewable under the CBA's grievance procedures, be-
cause its actions were "mandated by" the Control Board and 
"were taken notwithstanding the provisions of the [CBA]." 
Id. at 198-99.

 The Faculty filed the instant lawsuit on May 15, 1997, 
naming the Control Board and UDC as defendants. The suit 
alleged that the Control Board had exceeded its congression-
ally-delegated authority, and that UDC had violated the 
terms of the CBA. On February 3, 1998, the District Court 
granted the Faculty's motion for summary judgment. See 
University of the Dist. of Columbia Faculty Ass'n/NEA v. 
Board of Trustees of the Univ. of the Dist. of Columbia, 994 
F. Supp. 1 (D.D.C. 1998) ("UDC Faculty"). The court sur-
veyed the congressional acts that delineated the scope of the 
Control Board's authority and found no basis for the order 
that the Control Board had promulgated. See id. at 10. 
Accordingly, the court found UDC in breach of the CBA and 
ordered "full compliance by the University with the terms of 


the [CBA]." University of the Dist. of Columbia Faculty 
Ass'n/NEA v. Board of Trustees of the Univ. of the Dist. of 
Columbia, No. 97-01080 (D.D.C. Feb. 3, 1998) ("UDC Faculty 
Order"), reprinted in J.A. 244.

 This appeal followed. In addition to challenging the Dis-
trict Court's interpretation of the relevant congressional stat-
utes, appellants contend for the first time that the District 
Court lacked subject matter jurisdiction to consider this case.

 II. Analysis

 A.The Ultra Vires Claim

 1. Jurisdiction

 Appellants now claim that, under District of Columbia law 
and the terms of the CBA, the Faculty should have sought 
redress through arbitration rather than in the District Court. 
They contend that the District Court improperly exercised 
subject matter jurisdiction over the case, and request a 
remand with orders to dismiss. It is, of course, axiomatic 
that a challenge to the jurisdiction of a federal district court 
may be raised for the first time on appeal. See Insurance 
Corp. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 
701-02 (1982). The Control Board's jurisdictional claim fails, 
however, not because it is untimely, but because it is without 
merit.

 Section 105(a) of the FRMAA, which provides for jurisdic-
tion in the District Court, reads as follows:

 Jurisdiction Established in District Court for District 
 of Columbia.--Except as provided in section 103(e)(2) 
 (relating to the issuance of an order enforcing a subpoe-
 na), any action against the [Control Board] or any action 
 otherwise arising out of this Act, in whole or in part, 
 shall be brought in the United States District Court for 
 the District of Columbia.

FRMAA s 105(a). In their brief to this court, appellants 
virtually ignore s 105(a), relegating it to passing mention in a 
footnote. See Brief of Appellants at 24 n.11. Instead, appel-

lants claim that "[t]he essence of the plaintiffs' claim here was 
for breach of contract; the [Control Board's] Order, if valid, 
was a defense to that claim." Id. Thus, according to appel-
lants, the Faculty's action did not arise under the FRMAA, 
but rather arose under the terms of the CBA, and should 
have been adjudicated under the CBA's grievance and arbi-
tration procedures. This argument is simply wrong, because 
it patently mischaracterizes the gravamen of the Faculty's 
claim.

 The Faculty's complaint alleged, inter alia, that "[t]he 
action of the Control Board in promulgating the Control 
Board Order was neither required nor authorized by the 
[FRMAA], as amended, or by any other Act of Congress." 
Complaint p 33, reprinted in J.A. 13. The complaint went on 
to request that the District Court "[d]eclare that the Control 
Board Order ... [was] ultra vires, and ... therefore null and 
void and of no effect." Id. at 18-19, reprinted in J.A. 18-19. 
In short, the Faculty's primary contention before the District 
Court was that the Control Board exceeded its authority 
when it issued the disputed order. In fact, the principal focus 
of the parties in the trial court was on the validity of the 
Control Board's order. Given the complaint before the Dis-
trict Court and the issues addressed by the parties at trial, it 
cannot seriously be disputed that, for the purposes of deter-
mining jurisdiction under s 105(a), the action was "against" 
the Control Board and "ar[ose] out of" the FRMAA. Accord-
ingly, the District Court properly exercised jurisdiction over 
the Faculty's ultra vires claim.

2.The Scope of the Control Board's Authority Under the 
 FRMAA

 This court reviews grants of summary judgment de novo. 
See Washington Teachers' Union Local #6 v. Board of Educ., 
109 F.3d 774, 778 (D.C. Cir. 1997). Because no factual 
matters are in dispute, we must determine whether the 
District Court's decision in favor of the Faculty was correct 
as a matter of law. We hold that it was.

 The Faculty's ultra vires claim is quite straightforward. 
As articulated by the District Court, the Faculty's contention 

is that "nowhere in the FRMAA's studiously detailed specifi-
cation of the Control Board's powers is there any mention of 
a power to unilaterally repudiate unwanted provisions in 
collective bargaining agreements previously entered into by 
the District of Columbia or its agencies." UDC Faculty, 994 
F. Supp. at 4. It is undisputed that the FRMAA does not 
expressly grant the Control Board the power to authorize 
nullification of existing collective bargaining agreements. 
The issue, then, is whether, as the Control Board asserts, the 
language of the FRMAA and subsequent legislation may be 
read to suggest that Congress intended the Control Board to 
have the power that it exercised when it issued the order.

 As an initial matter, we note that the Control Board's 
persistent refrain that Congress itself, by virtue of its plenary 
authority over the District, could have granted UDC the 
authority to unilaterally modify the CBA, see, e.g., Brief of 
Appellants at 29-30, is completely irrelevant to the issue at 
hand. The Control Board concedes, see Brief of Appellants 
at 6, and we agree, that Congress never delegated its plenary 
authority to the Control Board or any other agency of gov-
ernment in the District of Columbia. Thus, the Control 
Board's power over the District is limited in a way that 
Congress's is not; Congress's power is bounded only by the 
Constitution, whereas the Control Board's power is bounded 
by the parameters set forth in its enabling Act and subse-
quent legislation.

 The FRMAA itself does not lend support to the Control 
Board's claim of authority. It is true that Congress, in its 
statement of findings, detailed at length the unfortunate state 
of the District's financial health. See FRMAA s 2(a). Con-
gress also stated that the purpose of the Act was to "elimi-
nate budget deficits and cash shortages of the District" and 
"ensure the long-term financial, fiscal, and economic vitality 
and operational efficiency of the District." Id. s 2(b). Ap-
pellants contend that this background section of the FRMAA 
serves as "an indispensable road map to a reading of the 
statute as a whole." Brief of Appellants at 28. However, 
appellants' argument continually loses sight of the fact that 
Congress specifically enumerated the Control Board's powers 


in ss 103 and 203 of the FRMAA. And, as the District Court 
aptly noted, "given the well known concerns about how an 
unelected entity with considerable power over the District 
government's operations would affect 'Home Rule' " in the 
District, UDC Faculty, 994 F. Supp. at 6, it is hardly surpris-
ing that Congress did not grant the Control Board carte 
blanche to run the city.

 The only mention of collective bargaining agreements in 
the FRMAA is found in the provision granting the Control 
Board the authority to review and approve collective bargain-
ing agreements into which the D.C. Council proposes to 
enter. See FRMAA s 203(b)(1). Appellants claim that it is 
an "enormous stretch" to infer that when Congress gave the 
Control Board the authority to review and approve new 
collective bargaining agreements, it simultaneously meant to 
prohibit the Control Board from unilaterally modifying exist-
ing agreements. Brief of Appellants at 34. In other words, 
according to appellants, it was improper for the District 
Court to assume that, because Congress did not speak to the 
issue of existing collective bargaining agreements, it meant to 
protect such agreements from the authority of the Control 
Board. Appellants' premise--that the Control Board has the 
authority to do anything that is not expressly prohibited by 
the FRMAA--is quite extraordinary and we reject it.

 In Railway Labor Executives' Ass'n v. National Mediation 
Board, 29 F.3d 655 (D.C. Cir. 1994) (en banc), this court 
rejected an argument virtually identical to the one advanced 
by appellants in this case. In Railway Labor, the court 
invalidated the National Mediation Board's ("NMB") attempt 
to exercise a power that was not explicitly conferred by the 
Railway Labor Act ("RLA"), but which nevertheless fur-
thered the NMB's "purported mandate." Id. at 660. It is 
true, as appellants point out, that the facts of Railway Labor 
are distinguishable from those of this case, because Con-
gress's grant of authority to the NMB was narrower than 
that granted to the Control Board. Nevertheless, the funda-
mental principle of statutory interpretation articulated by the 
en banc court in Railway Labor is equally compelling in this 
case:


 The [NMB] does not even claim that the terms of [the 
 RLA] support the authority it asserts.... Instead, the 
 Board would have us presume a delegation of power 
 from Congress absent an express withholding of such 
 power. This comes close to saying that the [NMB] has 
 the power to do whatever it pleases merely by virtue of 
 its existence, a suggestion that we view to be incredible.

Id. at 659; see also American Petroleum Inst. v. EPA, 52 
F.3d 1113, 1120 (D.C. Cir. 1995). Despite the broad language 
of the FRMAA's findings and purposes section, which only 
establishes Congress's concern for the District's financial 
well-being, appellants cannot avoid the conclusion that their 
argument essentially boils down to a claim that because 
Congress never said that the Control Board could not unilat-
erally modify existing agreements, the power to do so is 
implicit in the Act.

 We agree with the District Court that appellants' reading 
of the FRMAA requires precisely the kind of tortured statu-
tory interpretation that we spurned in Railway Labor. See 
UDC Faculty, 994 F. Supp. at 7 ("[T]he position that the 
Control Board has taken in this litigation is analytically 
indistinguishable from one that already has been roundly 
rejected in [Railway Labor]."). We also agree with the 
District Court that it is highly unlikely that Congress intend-
ed to give the Control Board the power to repudiate existing 
labor contracts--a power that the Constitution denies to the 
States, see Allied Structural Steel Co. v. Spannaus, 438 U.S. 
234, 242-44 (1978) (explaining how the contract clause, U.S. 
Const. art. I, s 10, cl. 1, limits "the power of a State to 
abridge existing contractual relationships")--without seeing 
fit to mention this power even once in the Act or its legisla-
tive history. See UDC Faculty, 994 F. Supp at 8. In sum, 
we hold that the FRMAA, standing alone, does not provide 
the Control Board with the authority it exercised in this case.

3.The 1996 Amendment to the FRMAA

 The subsequent congressional legislation appellants cite in 
support of their argument is no more availing. Before the 
District Court, and in their brief to this court, appellants 

contended that the 1996 Amendment--granting the Control 
Board the power to "stand in the shoes" of the UDC Trust-
ees--established the Control Board's "independent" authority 
to issue its order. The theory was that if the UDC Trustees 
themselves had the authority in the event of a fiscal emergen-
cy to nullify certain provisions of the CBA, the Control Board 
could have done so as well, under the 1996 Amendment. See 
Brief for Appellants at 30-32.

 At oral argument, however, counsel for the Control Board 
essentially abandoned this argument, and rightfully so. The 
argument fails because it is simply not true that the UDC 
Trustees had the authority to repudiate the provisions at 
issue in the CBA. Article X of the CBA does give UDC the 
authority to "take whatever actions may be necessary to 
carry out the mission of the University in emergency situa-
tions." J.A. 122. However, Article X allows UDC to take 
such emergency actions only to the extent that they are not 
"specifically limited by the provisions of this Agreement." Id. 
By its very terms, then, the CBA does not allow UDC to 
repudiate the seniority, notice, and benefit provisions that it 
repudiated pursuant to the Control Board's order. Thus, as 
the District Court determined, "[b]ecause the University does 
not have an independent entitlement to renounce unwanted 
provisions in the Agreement, the Control Board, likewise, has 
no authority under the 1996 Amendment to compel renounce-
ment by the University." UDC Faculty, 994 F. Supp. at 9.

 Far from supporting appellants' cause, the 1996 Amend-
ment actually serves to weaken their contention that the 
broad language of the original FRMAA should be read to 
authorize the Control Board's action. Although the 1996 
Amendment gave the Control Board "enormous power vis--
vis the Mayor, as well as all department and agency heads 
subordinate to the Mayor," Shook, 132 F.3d at 779, it also 
further delineated the parameters of the Control Board's 
authority pursuant to the Act. Nothing in the original Act 
prohibited the Control Board from "standing in the shoes" of 
the Mayor and other officials, yet Congress felt it necessary 
to expressly grant the Control Board this authority in the 
1996 Amendment. While not dispositive, Congress's 1996 


amendment of the FRMAA certainly suggests that it did not 
intend, when it originally enacted the Act, to provide the 
Control Board with the unbridled authority that appellants 
seek.

4.The Appropriations Act

 Finally, appellants point to s 141 of the Appropriations 
Act, which directs the Control Board to "take such steps as 
are necessary" to avoid exceeding the $74 million deficit 
ceiling. Appropriations Act s 141(a)(2). The accompanying 
conference report states that the "conferees urge the Mayor, 
the City Council, and the control board to use every means 
possible to reduce the costs of operating the Nation's Capital 
and make every effort to avoid deficit spending." H.R. Conf. 
Rep. No. 104-740, at 17 (1996). Appellants contend that the 
language of s 141 and its legislative history establish authori-
ty for the Control Board's order. We disagree.

 It is clear to us, just as it was to the District Court, that 
s 141 of the Appropriations Act cannot be read to provide the 
Control Board with the grant of authority required to promul-
gate the order at issue in this case. The Act's cryptic 
direction to "take such steps as are necessary" surely does 
not give the Control Board unlimited authority, and the 
Control Board makes no such claim here. Rather, in citing 
the Appropriations Act, appellants once again appear to rely 
on the implicit contention that any action taken by the 
Control Board was lawful unless expressly prohibited by 
Congress. We rejected this kind of reasoning as specious in 
Railway Labor and we reject it here as well. In disposing of 
the parties' arguments on the Appropriations Act, the District 
Court got it right when it held that, in drafting s 141, 
Congress simply "communicated its desire for the Control 
Board to make full use of the powers that Congress had 
delegated to it in the FRMAA." UDC Faculty, 994 F. Supp. 
at 10.

 We note that our conclusion in this regard is supported by 
three additional points. First, while Congress may amend 
substantive law in an appropriations act, it must do so "clear-
ly." Robertson v. Seattle Audubon Soc'y, 503 U.S. 429, 440 

(1992). Section 141 is far from clear, inasmuch as it makes no 
reference to any grant of new authority to cut spending, and 
does not purport to amend the FRMAA. Second, under the 
language of s 141, the scope of the powers that the Control 
Board claims for itself would accrue as well to the District's 
Chief Financial Officer. There is nothing to suggest that 
Congress intended this result, and appellants do not even 
claim as much. Thus, it is doubtful that Congress viewed 
s 141 as vesting broad new powers in either the Chief 
Financial Officer or the Control Board. Third, in s 140(b) of 
the Appropriations Act, the section immediately preceding 
the one upon which appellants rely, Congress authorized 
agency heads in the District (but not the UDC Trustees) to 
terminate employees "[n]otwithstanding any other provision 
of law, regulation, or collective bargaining agreement." Ap-
propriations Act s 140(b). This authorization undermines 
appellants' argument by making clear that if Congress meant 
to suggest that it could authorize certain District officials to 
abrogate existing collective bargaining agreements, it knew 
how to do so expressly. Section 140(b) also contains proce-
dural protections for terminated employees that were not 
provided to the faculty members in this case, suggesting that 
the Control Board's claim of unfettered discretion to termi-
nate existing collective bargaining agreements far exceeds the 
scope of authority that Congress might have delegated.

5.Summary

 We affirm the District Court's determination that the Con-
trol Board's order was issued ultra vires. Nothing in the 
FRMAA or in the subsequent congressional legislation cited 
by appellants gave the Control Board the authority to repudi-
ate the CBA. Accordingly, we hold that the order was 
without legal effect.

 B.The Contract Claim

 In conjunction with its primary contention that the Control 
Board's order was issued without legal authority, the Faculty 
argues that, if that is the case, UDC undeniably violated the 
terms of the CBA. The Faculty's complaint therefore re-
quested that the District Court declare that "all actions taken 


pursuant to the Order are rescinded." Complaint at 19, 
reprinted in J.A. 19. The District Court did so, declaring 
UDC to be in breach of the CBA and ordering "full compli-
ance" with its terms. UDC Faculty Order at 2, reprinted in 
J.A. 244. Nothing in the record indicates that the parties or 
the trial court dwelt long, if at all, on the contract claim. 
Rather, as noted above, the principal focus in the District 
Court was on the validity of the order. It appears that the 
District Court, after finding that the Control Board's order 
was ultra vires, concluded, a fortiori, that UDC had breached 
the CBA.

 The Faculty asserts that, because the contract claim was 
undoubtedly "related to" the ultra vires claim, the District 
Court properly exercised its supplemental jurisdiction in con-
sidering and resolving the contract claim. See 28 U.S.C. 
s 1367(a) (1994). Appellants, however, contend that, under 
the terms of the CBA, and in accordance with District of 
Columbia law, the Faculty was required to submit its griev-
ance to arbitration before bringing a breach of contract action 
in court. See District of Columbia v. Thompson, 593 A.2d 
621, 635 (D.C. 1991) (holding that the D.C. Council intended 
the District's Comprehensive Merit Personnel Act ("CMPA"), 
D.C. Code Ann. ss 1-601.1 to -637.2, to provide District 
employees with an exclusive administrative remedy for the 
resolution of their grievances); J.A. 117-21 (detailing the 
CBA's grievance procedure). Thus, appellants argue that the 
District Court never had jurisdiction over the contract claim, 
because the Faculty failed to exhaust its administrative reme-
dies.

 In the trial court, however, appellants never raised exhaus-
tion, in part because they appeared to concede that the CBA 
had been abrogated pursuant to the Control Board's order. 
Accordingly, the Faculty claims that appellants waived their 
exhaustion defense by failing to raise it before the District 
Court. The Faculty also asserts that, under District of 
Columbia law, it would have been futile to pursue arbitration 
in the face of UDC's flat refusal to follow the CBA's griev-
ance procedures. See Board of Trustees, Univ. of the Dist. of 
Columbia v. Myers, 652 A.2d 642, 645 (D.C. 1995) (establish-


ing that a showing of futility may overcome an employer's 
exhaustion defense). For their part, appellants cite Thomp-
son and its progeny for the proposition that the so-called 
"exhaustion" requirement is, in fact, jurisdictional and, there-
fore, cannot be waived. See Brief of Appellants at 20-24.

 In our view, the parties are on a wild goose chase in 
contesting whether the CBA's grievance procedures amount 
to a "jurisdictional" bar that precludes resolution of the 
contract claim in District Court. District of Columbia law 
clearly subscribes to the rule--long considered fundamental 
to federal labor policy--that parties to a collective bargaining 
agreement who have agreed to submit their disputes to 
arbitration normally may not bypass their contract grievance 
procedures in favor of a lawsuit. In Jordan v. Washington 
Metropolitan Area Transit Authority, 548 A.2d 792, 796 
(D.C. 1988), the D.C. Court of Appeals stressed that:

 if the collective bargaining agreement establishes proce-
 dures which are intended to be exclusive for resolving 
 employer-employee grievances ... and if the employee 
 brings suit against the employer before those grievance 
 procedures have been exhausted, the employer may de-
 fend on the ground that the employee has not exhausted 
 the exclusive remedies available under the contract.

(footnote omitted); see also Myers, 652 A.2d at 645; cf. 
Communications Workers v. AT&T, 40 F.3d 426, 434 (D.C. 
Cir. 1994) ("It is a well-settled rule of labor law that parties to 
a collective bargaining agreement normally must seek to 
resolve their contract disputes under agreed-upon grievance 
and arbitration procedures; and where the parties have 
agreed to final and binding arbitration, disputes within the 
scope of the arbitration clause may not be pursued in a 
breach of contract action under section 301 of the [Labor 
Management Relations Act] in lieu of arbitration.").

 Under prevailing D.C. and federal law, an employee may 
bypass the agreed-upon arbitration procedures only by show-
ing that the "grievance procedures are unreasonable or that 
the hostility of union officials makes a fair hearing impossi-
ble," Jordan, 548 A.2d at 797 (citations omitted), or that 

"pursuit of [administrative] remedies would be futile." 
Myers, 652 A.2d at 645; see also Vaca v. Sipes, 386 U.S. 171, 
185-88 (1967). In this case, nothing about the CBA's griev-
ance procedures is alleged to be unreasonable. And, since it 
is the faculty's union that brought this action, there is certain-
ly no claim that the union has breached its duty of fair 
representation. Finally, although the Faculty now contends 
that an attempt to arbitrate would be futile, the District 
Court has made no such finding. Thus, it appears that the 
Faculty's contract claim is subject to arbitration.

 It is true that the D.C. Court of Appeals, in Wilson v. 
District of Columbia, 608 A.2d 161, 161 n.1 (D.C. 1992), 
intimated in a footnote that failure to raise exhaustion in the 
trial court could preclude the defense on appeal. It is also 
true that the D.C. Court of Appeals has never explicitly 
referred to the exhaustion requirement as a "jurisdictional" 
bar, thus at least ostensibly leaving open the possibility that a 
federal district court could hear an employee grievance under 
its supplemental jurisdiction if an objection to exhaustion has 
been waived. The Faculty would have us conclude from 
these two facts that, as a matter of District of Columbia law, 
appellants have waived their exhaustion defense in this case, 
because the issue was never raised by appellants before the 
District Court.

 We decline the invitation to decide this question. We are 
convinced that, in normal circumstances, D.C. law holds that 
parties to a collective bargaining agreement must resolve 
their contract disputes under agreed-upon grievance and 
arbitration procedures. In this case, however, because of the 
way the matter was initially presented, neither party focused 
on the contractual issue in the District Court. Appellants' 
failure to raise the so-called exhaustion issue is at least 
partially explained by the fact that the validity of the Control 
Board's order, and not the actual RIF, was the primary 
concern of the parties in the trial court. In these circum-
stances, we are loath to find that appellants "waived" any-
thing; indeed, all that may be at issue here is a possible 
"forfeiture" of the exhaustion defense. Cf. United States v. 
Olano, 507 U.S. 725, 733 (1993) (explaining the legal distinc-


tion between "waiver" and "forfeiture"). In any event, we 
happily eschew the temptation to wander through the maze of 
District of Columbia law--to cut fine lines between futility, 
forfeiture, waiver, exhaustion, and jurisdiction--when a less 
indulgent course is apparent.

 Prudence beckons, so we will remand the contract claim to 
the District Court. Upon remand, the District Court should 
determine whether there are any viable issues remaining to 
be resolved in arbitration; if the trial court so finds, then the 
case should be submitted to arbitration. In other words, the 
District Court should not resolve the contractual issue unless 
UDC, upon remand, (1) refuses to participate in an arbitra-
tion of the merits of the Faculty's contract claim, so that a 
remand to arbitration would be futile; or (2) abandons its 
exhaustion defense in light of our decision that the Control 
Board's action was ultra vires.

 III. Conclusion

 For the reasons stated above, we affirm the opinion of the 
District Court, insofar as it holds that the Control Board 
acted ultra vires when it issued its order. We remand to the 
District Court to determine whether the Faculty's contract 
claim should now be submitted to arbitration.

 So ordered.