**UNIVERSITY OF THE DISTRICT OF COLUMBIA FACULTY ASSOCIATION/NEA, et al., Appellees,**

v.

**DISTRICT OF COLUMBIA FINANCIAL RESPONSIBILITY AND MANAGEMENT ASSISTANCE AUTHORITY, et al., Appellants.**

**Nos. 98–7024 and 98–7025.**

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 30, 1998.

Decided Dec. 22, 1998.

Daniel A. Rezneck argued the cause for appellants. With him on the briefs was Robin C. Alexander. John M. Ferren, Corporation Counsel, Charles L. Reischel, Deputy Corporation Counsel, and Lutz Alexander Prager, Assistant Deputy Corporation Counsel, entered appearances.

Andrew D. Roth argued the cause for appellees. With him on the brief was Laurence Gold. Jeffrey L. Gibbs entered an appearance.

Before: EDWARDS, Chief Judge, GINSBURG and ROGERS, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

EDWARDS, Chief Judge:

In response to the District of Columbia's "financial problems and management inefficiencies," Congress enacted the District of Columbia Financial Responsibility and Management Assistance Act of 1995, Pub.L. No. 104–8, 109 Stat. 97 (1995) ("FRMAA" or

"Act"). Under the Act, a Control Board was granted substantial authority over the financial management of the District. The scope of this statutory authority is at issue in this case.

In 1997, in an effort to keep the District's budget under a congressionally-imposed deficit ceiling, the Control Board issued an order authorizing the Board of Trustees ("Trustees") of the University of the District of Columbia ("UDC") to reduce its faculty "[n]otwithstanding the provisions of any collective bargaining agreement." Joint Appendix ("J.A.") 88. Appellees—UDC faculty members—contend that the Control Board's order was *ultra vires* and, therefore, without legal effect. Accordingly, they assert, UDC violated the collective bargaining agreement between the university and the faculty when it conducted a reduction-in-force ("RIF") that disregarded the specific provisions covering RIFs in the parties' agreement.

We agree with the District Court that Congress did not grant the Control Board the authority to abrogate existing contracts between the District and its employees. Because the Control Board's action was *ultra vires*, we remand appellees' contract claim to the District Court for a determination as to whether the claim should now be submitted to arbitration.

## I. BACKGROUND

Congress created the Control Board in April 1995, citing the District's "fail[ure] to provide its citizens with effective and efficient services," warning that "[t]he current financial and management problems of the District government have already adversely affected the long-term economic health of the District," and calling for "[a] comprehensive approach to fiscal, management, and structural problems ... which exempts no part of the District government." FRMAA § 2(a).

Sections 103 and 203 of the FRMAA delineate the authority of the Control Board, the members of which are appointed by the President. Under these provisions, the Control Board is empowered to hold hearings and receive evidence, obtain official data from the federal and District Government, issue subpoenas, enter into contracts, and approve or disapprove of Acts passed by the D.C. Council. *See* FRMAA §§ 103, 203; *see also*

*Shook v. District of Columbia Fin. Responsibility and Management Assistance Auth.*, 132 F.3d 775, 777 (D.C.Cir.1998) ("[T]he Control Board has been given wide-ranging powers to improve the District government's operations.").

In July 1996, Congress enacted the District of Columbia Appropriations Act, 1997, Pub.L. No. 104–194, 110 Stat. 2356 (1996) ("Appropriations Act"). Section 141(a)(1) of the Appropriations Act imposed on the District a deficit ceiling of $74 million for fiscal year 1997. *See* Appropriations Act § 141(a)(1). Section 141(a)(2) stated that the "Chief Financial Officer of the District of Columbia [and the Control Board] shall take such steps as are necessary to assure that the District of Columbia meets the requirements of this section." *Id.* § 141(a)(2).

Congress subsequently amended the FRMAA. *See* Omnibus Consolidated Appropriations Act, 1997, Pub.L. No.104–208, 110 Stat. 3009 (1996). The amended § 207(d)(1) ("1996 Amendment") gives the Control Board the power to issue "such orders, rules, or regulations as it considers appropriate to carry out the purposes of [the FRMAA] ... to the extent that the issuance of such an order, rule, or regulation is within the authority of the Mayor or the head of any department or agency of the District government." *Id.* § 5203(f). The parties agree that the 1996 Amendment allows the Control Board to "stand in the shoes" of the Mayor and other District officials—such as the UDC Trustees—and perform whatever functions those officials would be authorized to perform themselves.

As fiscal year 1997 unfolded, the District was in grave danger of exceeding the $74 million deficit ceiling. UDC was a major contributor to the deficit, so university officials were obliged to consider spending limitations to cut costs. Among the options available to UDC was a RIF of faculty members. This option was less than ideal, however, because UDC was bound to comply with the enumerated RIF and employee benefit protections contained in the faculty's collective bargaining agreement ("CBA"). Although the CBA permits UDC to conduct a RIF when such action is compelled by a

fiscal emergency, it affords important protections for the faculty in the event of a RIF. First, the agreement provides that senior members of the faculty must be retained ahead of junior members. *See* J.A. 163. Second, the agreement requires that faculty members receive one year's notice of a RIF or severance pay in lieu thereof. *See id.* at 165. The CBA also mandates that UDC "maintain" the retirement plans of existing faculty members. *Id.* at 152.

On January 13, 1997, Julius F. Nimmons, Jr., Acting President of UDC, wrote to Dr. Andrew F. Brimmer, chairman of the Control Board, requesting that the Control Board exempt UDC from the seniority, notice, and benefits provisions of the CBA. *See id.* at 84–85. Nimmons wrote that "[i]t would be impossible for the University to meet the goals of my [financial] plan without the legal authority" requested in the letter. *Id.* at 84.

Nine days later, the Control Board responded by issuing the order at issue in this case. Noting that "a state of fiscal crisis exists" at UDC and that the CBA represents a "significant impediment[ ] to the achievement of any budget savings through personnel reductions," the Control Board found that "there are no other less drastic means of achieving the required budget savings than through the unilateral modification of the [CBA]." *Id.* at 87. Accordingly, the Control Board authorized UDC, "[n]otwithstanding ... the provisions of any collective bargaining agreement, [to] ... conduct its [RIF] in a manner which will allow it to achieve its planned budget savings." *Id.* at 87–88. The order specifically directed that UDC contribute no more than 7% to its employee retirement plans, and allowed UDC to disregard the seniority and notice provisions of the CBA. *See id.* On February 4, 1997, the UDC Trustees implemented the Control Board's order by approving a RIF that did, in fact, disregard the applicable terms of the CBA. *See id.* at 103–05. UDC also lowered its contributions to the faculty retirement plan to 7%, effective March 1, 1997.

On February 14, 1997, the UDC Faculty Association ("Faculty") challenged the RIF by filing grievances pursuant to the grievance procedures outlined in the CBA. UDC responded on April 7, 1997, in a letter stating that UDC's actions were not reviewable under the CBA's grievance procedures, because its actions were "mandated by" the Control Board and "were taken notwithstanding the provisions of the [CBA]." *Id.* at 198–99.

The Faculty filed the instant lawsuit on May 15, 1997, naming the Control Board and UDC as defendants. The suit alleged that the Control Board had exceeded its congressionally-delegated authority, and that UDC had violated the terms of the CBA. On February 3, 1998, the District Court granted the Faculty's motion for summary judgment. *See University of the Dist. of Columbia Faculty Ass'n/NEA v. Board of Trustees of the Univ. of the Dist. of Columbia,* 994 F.Supp. 1 (D.D.C.1998) (*"UDC Faculty"*). The court surveyed the congressional acts that delineated the scope of the Control Board's authority and found no basis for the order that the Control Board had promulgated. *See id.* at 10. Accordingly, the court found UDC in breach of the CBA and ordered "full compliance by the University with the terms of the [CBA]." *University of the Dist. of Columbia Faculty Ass'n/NEA v. Board of Trustees of the Univ. of the Dist. of Columbia,* No. 97–01080 (D.D.C. Feb. 3, 1998) (*"UDC Faculty Order"*), *reprinted in* J.A. 244.

This appeal followed. In addition to challenging the District Court's interpretation of the relevant congressional statutes, appellants contend for the first time that the District Court lacked subject matter jurisdiction to consider this case.

## II. ANALYSIS

### A. The Ultra Vires *Claim*

#### 1. Jurisdiction

■ Appellants now claim that, under District of Columbia law and the terms of the CBA, the Faculty should have sought redress through arbitration rather than in the District Court. They contend that the District Court improperly exercised subject matter jurisdiction over the case, and request a remand with orders to dismiss. It is, of course, axiomatic that a challenge to the jurisdiction of a federal district court may be raised for the first time on appeal. *See Insurance Corp. v. Compagnie des Bauxites de Guinee,*

456 U.S. 694, 701–02, 102 S.Ct. 2099, 72 L.Ed.2d 492 (1982). The Control Board's jurisdictional claim fails, however, not because it is untimely, but because it is without merit.

■ Section 105(a) of the FRMAA, which provides for jurisdiction in the District Court, reads as follows:

> JURISDICTION ESTABLISHED IN DISTRICT COURT FOR DISTRICT OF COLUMBIA.—Except as provided in section 103(e)(2) (relating to the issuance of an order enforcing a subpoena), any action against the [Control Board] or any action otherwise arising out of this Act, in whole or in part, shall be brought in the United States District Court for the District of Columbia.

FRMAA § 105(a). In their brief to this court, appellants virtually ignore § 105(a), relegating it to passing mention in a footnote. *See* Brief of Appellants at 24 n.11. Instead, appellants claim that "[t]he essence of the plaintiffs' claim here was for breach of contract; the [Control Board's] Order, if valid, was a defense to that claim." *Id.* Thus, according to appellants, the Faculty's action did not arise under the FRMAA, but rather arose under the terms of the CBA, and should have been adjudicated under the CBA's grievance and arbitration procedures. This argument is simply wrong, because it patently mischaracterizes the gravamen of the Faculty's claim.

The Faculty's complaint alleged, *inter alia*, that "[t]he action of the Control Board in promulgating the Control Board Order was neither required nor authorized by the [FRMAA], as amended, or by any other Act of Congress." Complaint ¶ 33, *reprinted in* J.A. 13. The complaint went on to request that the District Court "[d]eclare that the Control Board Order ... [was] *ultra vires*, and ... therefore null and void and of no effect." *Id.* at 18–19, *reprinted in* J.A. 18–19. In short, the Faculty's primary contention before the District Court was that the Control Board exceeded its authority when it issued the disputed order. In fact, the principal focus of the parties in the trial court was on the validity of the Control Board's order. Given the complaint before the District Court and the issues addressed by the parties at trial, it cannot seriously be disputed that, for the purposes of determining jurisdiction under § 105(a), the action was "against" the Control Board and "ar[ose] out of" the FRMAA. Accordingly, the District Court properly exercised jurisdiction over the Faculty's *ultra vires* claim.

2. The Scope of the Control Board's Authority Under the FRMAA

■ This court reviews grants of summary judgment *de novo*. *See Washington Teachers' Union Local #6 v. Board of Educ.*, 109 F.3d 774, 778 (D.C.Cir.1997). Because no factual matters are in dispute, we must determine whether the District Court's decision in favor of the Faculty was correct as a matter of law. We hold that it was.

■ The Faculty's *ultra vires* claim is quite straightforward. As articulated by the District Court, the Faculty's contention is that "nowhere in the FRMAA's studiously detailed specification of the Control Board's powers is there any mention of a power to unilaterally repudiate unwanted provisions in collective bargaining agreements previously entered into by the District of Columbia or its agencies." *UDC Faculty*, 994 F.Supp. at 4. It is undisputed that the FRMAA does not expressly grant the Control Board the power to authorize nullification of existing collective bargaining agreements. The issue, then, is whether, as the Control Board asserts, the language of the FRMAA and subsequent legislation may be read to suggest that Congress intended the Control Board to have the power that it exercised when it issued the order.

As an initial matter, we note that the Control Board's persistent refrain that Congress itself, by virtue of its plenary authority over the District, could have granted UDC the authority to unilaterally modify the CBA, *see, e.g.*, Brief of Appellants at 29–30, is completely irrelevant to the issue at hand. The Control Board concedes, *see* Brief of Appellants at 6, and we agree, that Congress never delegated its plenary authority to the Control Board or any other agency of government in the District of Columbia. Thus, the Control Board's power over the District is limited in a way that Congress's is not; Congress's power is bounded only by the Constitution, whereas the Control Board's

power is bounded by the parameters set forth in its enabling Act and subsequent legislation.

The FRMAA itself does not lend support to the Control Board's claim of authority. It is true that Congress, in its statement of findings, detailed at length the unfortunate state of the District's financial health. *See* FRMAA § 2(a). Congress also stated that the purpose of the Act was to "eliminate budget deficits and cash shortages of the District" and "ensure the long-term financial, fiscal, and economic vitality and operational efficiency of the District." *Id.* § 2(b). Appellants contend that this background section of the FRMAA serves as "an indispensable road map to a reading of the statute as a whole." Brief of Appellants at 28. However, appellants' argument continually loses sight of the fact that Congress *specifically enumerated* the Control Board's powers in §§ 103 and 203 of the FRMAA. And, as the District Court aptly noted, "given the well known concerns about how an unelected entity with considerable power over the District government's operations would affect 'Home Rule'" in the District, *UDC Faculty,* 994 F.Supp. at 6, it is hardly surprising that Congress did not grant the Control Board *carte blanche* to run the city.

The only mention of collective bargaining agreements in the FRMAA is found in the provision granting the Control Board the authority to review and approve collective bargaining agreements into which the D.C. Council proposes to enter. *See* FRMAA § 203(b)(1). Appellants claim that it is an "enormous stretch" to infer that when Congress gave the Control Board the authority to review and approve *new* collective bargaining agreements, it simultaneously meant to prohibit the Control Board from unilaterally modifying *existing* agreements. Brief of Appellants at 34. In other words, according to appellants, it was improper for the District Court to assume that, because Congress did not speak to the issue of existing collective bargaining agreements, it meant to protect such agreements from the authority of the Control Board. Appellants' premise—that the Control Board has the authority to do anything that is not expressly prohibited by the FRMAA—is quite extraordinary and we reject it.

In *Railway Labor Executives' Ass'n v. National Mediation Board,* 29 ·F.3d 655 (D.C.Cir.1994) (en banc), this court rejected an argument virtually identical to the one advanced by appellants in this case. In *Railway Labor,* the court invalidated the National Mediation Board's ("NMB") attempt to exercise a power that was not explicitly conferred by the Railway Labor Act ("RLA"), but which nevertheless furthered the NMB's "purported mandate." *Id.* at 660. It is true, as appellants point out, that the facts of *Railway Labor* are distinguishable from those of this case, because Congress's grant of authority to the NMB was narrower than that granted to the Control Board. Nevertheless, the fundamental principle of statutory interpretation articulated by the en banc court in *Railway Labor* is equally compelling in this case:

> The [NMB] does not even claim that the terms of [the RLA] support the authority it asserts.... Instead, the Board would have us *presume* a delegation of power from Congress absent an express *withholding* of such power. This comes close to saying that the [NMB] has the power to do whatever it pleases merely by virtue of its existence, a suggestion that we view to be incredible.

*Id.* at 659; *see also American Petroleum Inst. v. EPA,* 52 F.3d 1113, 1120 (D.C.Cir. 1995). Despite the broad language of the FRMAA's findings and purposes section, which only establishes Congress's concern for the District's financial well-being, appellants cannot avoid the conclusion that their argument essentially boils down to a claim that because Congress never said that the Control Board could *not* unilaterally modify existing agreements, the power to do so is implicit in the Act.

We agree with the District Court that appellants' reading of the FRMAA requires precisely the kind of tortured statutory interpretation that we spurned in *Railway Labor. See UDC Faculty,* 994 F.Supp. at 7 ("[T]he position that the Control Board has taken in this litigation is analytically indistinguishable from one that already has been roundly rejected in [*Railway Labor*]."). We also agree with the District Court that it is highly un-

likely that Congress intended to give the Control Board the power to repudiate *existing* labor contracts—a power that the Constitution denies to the States, *see Allied Structural Steel Co. v. Spannaus,* 438 U.S. 234, 242–44, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978) (explaining how the contract clause, U.S. CONST. art. I, § 10, cl. 1, limits "the power of a State to abridge existing contractual relationships")—without seeing fit to mention this power even once in the Act or its legislative history. *See UDC Faculty,* 994 F.Supp. at 8. In sum, we hold that the FRMAA, standing alone, does not provide the Control Board with the authority it exercised in this case.

### 3. The 1996 Amendment to the FRMAA

The subsequent congressional legislation appellants cite in support of their argument is no more availing. Before the District Court, and in their brief to this court, appellants contended that the 1996 Amendment— granting the Control Board the power to "stand in the shoes" of the UDC Trustees— established the Control Board's "independent" authority to issue its order. The theory was that if the UDC Trustees themselves had the authority in the event of a fiscal emergency to nullify certain provisions of the CBA, the Control Board could have done so as well, under the 1996 Amendment. *See* Brief for Appellants at 30–32.

At oral argument, however, counsel for the Control Board essentially abandoned this argument, and rightfully so. The argument fails because it is simply not true that the UDC Trustees had the authority to repudiate the provisions at issue in the CBA. Article X of the CBA does give UDC the authority to "take whatever actions may be necessary to carry out the mission of the University in emergency situations." J.A. 122. However, Article X allows UDC to take such emergency actions only to the extent that they are not "specifically limited by the provisions of this Agreement." *Id.* By its very terms, then, the CBA does not allow UDC to repudiate the seniority, notice, and benefit provisions that it repudiated pursuant to the Control Board's order. Thus, as the District Court determined, "[b]ecause the University does not have an independent entitlement to renounce unwanted provisions in the Agree-

ment, the Control Board, likewise, has no authority under the 1996 Amendment to compel renouncement by the University." *UDC Faculty,* 994 F.Supp. at 9.

Far from supporting appellants' cause, the 1996 Amendment actually serves to weaken their contention that the broad language of the original FRMAA should be read to authorize the Control Board's action. Although the 1996 Amendment gave the Control Board "enormous power *vis-à-vis* the Mayor, as well as all department and agency heads subordinate to the Mayor," *Shook,* 132 F.3d at 779, it also further delineated the parameters of the Control Board's authority pursuant to the Act. Nothing in the original Act *prohibited* the Control Board from "standing in the shoes" of the Mayor and other officials, yet Congress felt it necessary to expressly grant the Control Board this authority in the 1996 Amendment. While not dispositive, Congress's 1996 amendment of the FRMAA certainly suggests that it did not intend, when it originally enacted the Act, to provide the Control Board with the unbridled authority that appellants seek.

### 4. The Appropriations Act

Finally, appellants point to § 141 of the Appropriations Act, which directs the Control Board to "take such steps as are necessary" to avoid exceeding the $74 million deficit ceiling. Appropriations Act § 141(a)(2). The accompanying conference report states that the "conferees urge the Mayor, the City Council, and the control board to use every means possible to reduce the costs of operating the Nation's Capital and make every effort to avoid deficit spending." H.R. CONF. REP. No. 104–740, at 17 (1996). Appellants contend that the language of § 141 and its legislative history establish authority for the Control Board's order. We disagree.

It is clear to us, just as it was to the District Court, that § 141 of the Appropriations Act cannot be read to provide the Control Board with the grant of authority required to promulgate the order at issue in this case. The Act's cryptic direction to "take such steps as are necessary" surely does not give the Control Board unlimited authority, and the Control Board makes no

such claim here. Rather, in citing the Appropriations Act, appellants once again appear to rely on the implicit contention that any action taken by the Control Board was lawful unless expressly prohibited by Congress. We rejected this kind of reasoning as specious in *Railway Labor* and we reject it here as well. In disposing of the parties' arguments on the Appropriations Act, the District Court got it right when it held that, in drafting § 141, Congress simply "communicated its desire for the Control Board to make full use of the powers that Congress had delegated to it in the FRMAA." *UDC Faculty*, 994 F.Supp. at 10.

■ We note that our conclusion in this regard is supported by three additional points. First, while Congress may amend substantive law in an appropriations act, it must do so "clearly." *Robertson v. Seattle Audubon Soc'y*, 503 U.S. 429, 440, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992). Section 141 is far from clear, inasmuch as it makes no reference to any grant of new authority to cut spending, and does not purport to amend the FRMAA. Second, under the language of § 141, the scope of the powers that the Control Board claims for itself would accrue as well to the District's Chief Financial Officer. There is nothing to suggest that Congress intended this result, and appellants do not even claim as much. Thus, it is doubtful that Congress viewed § 141 as vesting broad new powers in either the Chief Financial Officer *or* the Control Board. Third, in § 140(b) of the Appropriations Act, the section immediately preceding the one upon which appellants rely, Congress authorized agency heads in the District (but not the UDC Trustees) to terminate employees "[n]otwithstanding any other provision of law, regulation, or collective bargaining agreement." Appropriations Act § 140(b). This authorization undermines appellants' argument by making clear that if Congress meant to suggest that it could authorize certain District officials to abrogate existing collective bargaining agreements, it knew how to do so expressly. Section 140(b) also contains procedural protections for terminated employees that were not provided to the faculty members in this case, suggesting that the Control Board's claim of unfettered discretion to terminate existing collective bargaining agreements far exceeds the scope of authority that Congress might have delegated.

### 5. Summary

We affirm the District Court's determination that the Control Board's order was issued *ultra vires*. Nothing in the FRMAA or in the subsequent congressional legislation cited by appellants gave the Control Board the authority to repudiate the CBA. Accordingly, we hold that the order was without legal effect.

### B. The Contract Claim

In conjunction with its primary contention that the Control Board's order was issued without legal authority, the Faculty argues that, if that is the case, UDC undeniably violated the terms of the CBA. The Faculty's complaint therefore requested that the District Court declare that "all actions taken pursuant to the Order are rescinded." Complaint at 19, *reprinted in* J.A. 19. The District Court did so, declaring UDC to be in breach of the CBA and ordering "full compliance" with its terms. *UDC Faculty Order* at 2, *reprinted in* J.A. 244. Nothing in the record indicates that the parties or the trial court dwelt long, if at all, on the contract claim. Rather, as noted above, the principal focus in the District Court was on the validity of the order. It appears that the District Court, after finding that the Control Board's order was *ultra vires*, concluded, *a fortiori*, that UDC had breached the CBA.

The Faculty asserts that, because the contract claim was undoubtedly "related to" the *ultra vires* claim, the District Court properly exercised its supplemental jurisdiction in considering and resolving the contract claim. *See* 28 U.S.C. § 1367(a) (1994). Appellants, however, contend that, under the terms of the CBA, and in accordance with District of Columbia law, the Faculty was required to submit its grievance to arbitration before bringing a breach of contract action in court. *See District of Columbia v. Thompson*, 593 A.2d 621, 635 (D.C.1991) (holding that the D.C. Council intended the District's Comprehensive Merit Personnel Act ("CMPA"), D.C.CODE ANN. §§ 1–601.1 to –637.2, to provide District employees with an exclusive

administrative remedy for the resolution of their grievances); J.A. 117–21 (detailing the CBA's grievance procedure). Thus, appellants argue that the District Court never had jurisdiction over the contract claim, because the Faculty failed to exhaust its administrative remedies.

In the trial court, however, appellants never raised exhaustion, in part because they appeared to concede that the CBA had been abrogated pursuant to the Control Board's order. Accordingly, the Faculty claims that appellants waived their exhaustion defense by failing to raise it before the District Court. The Faculty also asserts that, under District of Columbia law, it would have been futile to pursue arbitration in the face of UDC's flat refusal to follow the CBA's grievance procedures. *See Board of Trustees, Univ. of the Dist. of Columbia v. Myers*, 652 A.2d 642, 645 (D.C.1995) (establishing that a showing of futility may overcome an employer's exhaustion defense). For their part, appellants cite *Thompson* and its progeny for the proposition that the so-called "exhaustion" requirement is, in fact, jurisdictional and, therefore, cannot be waived. *See* Brief of Appellants at 20–24.

█ In our view, the parties are on a wild goose chase in contesting whether the CBA's grievance procedures amount to a "jurisdictional" bar that precludes resolution of the contract claim in District Court. District of Columbia law clearly subscribes to the rule— long considered fundamental to federal labor policy—that parties to a collective bargaining agreement who have agreed to submit their disputes to arbitration normally may not bypass their contract grievance procedures in favor of a lawsuit. In *Jordan v. Washington Metropolitan Area Transit Authority*, 548 A.2d 792, 796 (D.C.1988), the D.C. Court of Appeals stressed that:

> if the collective bargaining agreement establishes procedures which are intended to be exclusive for resolving employer-employee grievances ... and if the employee brings suit against the employer before those grievance procedures have been exhausted, the employer may defend on the ground that the employee has not exhausted the exclusive remedies available under the contract.

(footnote omitted); *see also Myers*, 652 A.2d at 645; *cf. Communications Workers v. AT&T*, 40 F.3d 426, 434 (D.C.Cir.1994) ("It is a well-settled rule of labor law that parties to a collective bargaining agreement normally must seek to resolve their contract disputes under agreed-upon grievance and arbitration procedures; and where the parties have agreed to final and binding arbitration, disputes within the scope of the arbitration clause may not be pursued in a breach of contract action under section 301 of the [Labor Management Relations Act] in lieu of arbitration.").

█ Under prevailing D.C. and federal law, an employee may bypass the agreed-upon arbitration procedures only by showing that the "grievance procedures are unreasonable or that the hostility of union officials makes a fair hearing impossible," *Jordan*, 548 A.2d at 797 (citations omitted), or that "pursuit of [administrative] remedies would be futile." *Myers*, 652 A.2d at 645; *see also Vaca v. Sipes*, 386 U.S. 171, 185–88, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). In this case, nothing about the CBA's grievance procedures is alleged to be unreasonable. And, since it is the faculty's union that brought this action, there is certainly no claim that the union has breached its duty of fair representation. Finally, although the Faculty now contends that an attempt to arbitrate would be futile, the District Court has made no such finding. Thus, it appears that the Faculty's contract claim is subject to arbitration.

It is true that the D.C. Court of Appeals, in *Wilson v. District of Columbia*, 608 A.2d 161, 161 n. 1 (D.C.1992), intimated in a footnote that failure to raise exhaustion in the trial court could preclude the defense on appeal. It is also true that the D.C. Court of Appeals has never explicitly referred to the exhaustion requirement as a "jurisdictional" bar, thus at least ostensibly leaving open the possibility that a federal district court could hear an employee grievance under its supplemental jurisdiction if an objection to exhaustion has been waived. The Faculty would have us conclude from these two facts that, as a matter of District of Columbia law, appellants have waived their exhaustion defense in this case, because the issue was

never raised by appellants before the District Court.

We decline the invitation to decide this question. We are convinced that, in normal circumstances, D.C. law holds that parties to a collective bargaining agreement must resolve their contract disputes under agreed-upon grievance and arbitration procedures. In this case, however, because of the way the matter was initially presented, neither party focused on the contractual issue in the District Court. Appellants' failure to raise the so-called exhaustion issue is at least partially explained by the fact that the validity of the Control Board's order, and not the actual RIF, was the primary concern of the parties in the trial court. In these circumstances, we are loath to find that appellants "waived" anything; indeed, all that may be at issue here is a possible "forfeiture" of the exhaustion defense. *Cf. United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (explaining the legal distinction between "waiver" and "forfeiture"). In any event, we happily eschew the temptation to wander through the maze of District of Columbia law—to cut fine lines between futility, forfeiture, waiver, exhaustion, and jurisdiction—when a less indulgent course is apparent.

Prudence beckons, so we will remand the contract claim to the District Court. Upon remand, the District Court should determine whether there are any viable issues remaining to be resolved in arbitration; if the trial court so finds, then the case should be submitted to arbitration. In other words, the District Court should not resolve the contractual issue unless UDC, upon remand, (1) refuses to participate in an arbitration of the *merits* of the Faculty's contract claim, so that a remand to arbitration would be futile; or (2) abandons its exhaustion defense in light of our decision that the Control Board's action was *ultra vires.*

### III. Conclusion

For the reasons stated above, we affirm the opinion of the District Court, insofar as it holds that the Control Board acted *ultra vires* when it issued its order. We remand to the District Court to determine whether

the Faculty's contract claim should now be submitted to arbitration.

*So ordered.*